[Civ. No. 2980.   Fourth Dist.   Oct. 5, 1942.]

ROMAN CATHOLIC BISHOP OF SAN DIEGO (a Corporation Sole), Respondent, v. NORRIS B. LAWRENCE, as Executor, etc., et al., Appellants.

Hert & Withington and Fred A. Wilson for Appellants.

Charleville & Weddell and Martin J. Coughlin for Respondent.

BARNARD, P. J.—This in an action to quiet title to certain real property which had been deeded to the plaintiff by May Adeline Driscoll, but which in a later will Mrs. Driscoll left to the defendant, Mrs. Dewey Smart. The property in question is a duplex house in Colton, one part of which Mrs. Driscoll occupied as a home and the other part of which she rented. The court found in all respects in favor of the plaintiff and the defendants have appealed.

On August 5, 1938, Mrs. Driscoll, who was then 61 years of age, came to St. Bernardine's Hospital in San Bernardino suffering from a heart attack, to which malady she had been subject for some years. It appears, without conflict, that while she was physically very ill she was mentally alert, and that for several years she had intended to leave her home, the duplex, to the Catholic Church. On a number of occasions, over a period of two years, she had told two of her neighbors of this intention. Father Mathews, chaplain for the hospital, who had not previously known her, made a routine call upon her on the day she entered the hospital. During their conversation Mrs. Driscoll told him that she realized her days were numbered, that she wished to make a will, that she wished to leave the property she lived in for the benefit of the Colton parish, and that she wanted to remember certain of her friends with some cash. He told her that he would call an attorney to make out a will for her, which he did. This attorney first visited Mrs. Driscoll alone. She gave him instructions for drawing her will, telling him that she owned this duplex and had about $2,000 in the bank, that she had a brother in Ireland whom she had not heard from for many years, that she did not want him to have any of her property, that she wanted to leave $100 each to four of her neighbors who had been kind to her, that she wanted the parish in Colton to have her real estate, the duplex property, and that she wanted any balance of her money to go to Father Mathews. At that time the attorney explained to her the probate provisions relative to charitable bequests and told her these restrictions might prevent the carrying out of her wishes with respect to her real property if she died within thirty days and partially prevent this if she died within six months. Mrs. Driscoll then said: "Well, I want the Church to have this property," and asked the attorney if there was any positive or sure way this could be accomplished. He told her it could be done by executing a deed to the property and explained to her that the effect of a deed

would be an immediate conveyance of the property, passing title to the property at once, while a will would only take effect upon her death. She replied that she wanted the Church to have the property and instructed him to prepare such a deed and to prepare a will with reference to her personal property, her final instruction being: "Go ahead and make up the deed and the will."

The attorney called Father Mathews and explained to him the reason for making the deed and inquired as to the proper designation of the grantee in a deed to the Church. Thereupon, Father Mathews made a second call on Mrs. Driscoll and assured her that the bishop would not interfere with her staying in the home while she lived, and that she would be allowed to continue in possession of the property as long as she lived. Mrs. Driscoll then informed him that she wanted the Church to pay her funeral expenses so that this expense would not come out of her personal property, and Father Mathews agreed that this would be done. Father Mathews also testified that he assured her that the deed would not be recorded, although he was not certain whether that assurance was given at that time or on a later occasion.

On the next day, August 6, 1938, the deed to the duplex property which had been prepared by the attorney, and which named the plaintiff as grantee, was executed by Mrs. Driscoll in the presence of the attorney, a notary and two nurses. After the notary had placed the acknowledgment certificate thereon Mrs. Driscoll delivered the deed to the attorney and asked him to deliver it to Father Mathews. This he did, and Father Mathews, on the same day, mailed the deed to the bishop at San Diego. Immediately after the deed was executed the will disposing of her personal property was signed by Mrs. Driscoll and two witnesses thereto. Mrs. Driscoll retained the original will and the attorney kept a copy. Two days later, Mrs. Driscoll was sufficiently recovered to return to her home. Shortly thereafter, Father Mathews delivered to her a letter from the bishop thanking her for the property. At the request of the bishop, Father Mathews then asked her whether or not she desired the Church to take care of the taxes and insurance on the property. Mrs. Driscoll replied that these were paid up to date and that she would take the rent from the other part of the duplex and take care of these things in the future. Shortly after her return from the hospital, on separate occasions, Mrs. Driscoll informed

two of her neighbors that she had deeded her property to the Catholic Church and that she had also made a will in which she had remembered them. One of these witnesses testified that Mrs. Driscoll also told her that she did not want anyone to know she had deeded the property to the Church and that she further stated that ''she had deeded the place to the Catholic Church, but she was going to ask for the deed, but she was going to let it stand as it was, but she only wanted the deed of her property.''

On October 17, 1938, the attorney who had prepared the deed and the will called at Mrs. Driscoll's home and she paid him for his services and expressed no dissatisfaction with what had been done. Some time in November, 1938, Mrs. Driscoll called Father Mathews, who came to her home. She then told him that some of her neighbors had said that the bishop had recorded the deed and was going to throw her out on the street. He testified that she was quite disturbed, not about the deed but about ''the fact she was going to be thrown out on the street,'' that he assured her that this was not so, and she replied: ''I will take your word for it.'' He then testified that to make doubly sure he told her that he would ask the bishop to send him the deed so he could show it to her ''to put her mind at rest about being thrown out of her property''; that shortly thereafter he got the deed from the bishop; that he took the deed to her home and asked her to observe that it had not been recorded; that he then said: ''I will leave it with you now and keep it safe because it is a very important document''; that she replied: ''You know, Father, I want the Church to have the property''; and that he left the deed with her and had never seen it since.

On November 30, 1939, Mrs. Driscoll suffered a stroke of paralysis and was taken to the Loma Linda Hospital. The next day, her doctor asked Mrs. Smart, who had been a friend of Mrs. Driscoll's, whether Mrs. Driscoll had sufficient money to pay her hospital expenses. At that time Mrs. Driscoll was paralyzed and was unable to talk, and Mrs. Smart knew nothing of her business affairs. Mrs. Smart took a man with her and went to Mrs. Driscoll's home to look for a will and any papers which might indicate whether she had any money. She found nothing in Mrs. Driscoll's desk, but in a dresser drawer she found two bank books, a receptacle containing documents, and the will which Mrs. Driscoll had executed on August 6, 1938, which had been torn in a number of pieces.

She testified that she put the will together on the bed but that she did not examine the receptacle containing documents because the bank books gave her the information she wanted, that she took the receptacle containing the documents to a bank and left it there, that she then showed the mutilated will to the doctor, that she then called another attorney and asked him to come to the hospital, that she then gave him this mutilated will, and that after Mrs. Driscoll's death she got the documents from the bank and gave them to the executor, without examining them. Mrs. Driscoll died on December 6, 1939. At some time after November 30, 1939, she executed a will leaving this real property to Mrs. Smart, but it does not appear just when this will was executed or how much her condition had improved after December 1, when she was unable to talk.

It appears from the mutilated will, as pieced together, that on October 12, 1938, Mrs. Driscoll made some alterations and changes thereon with a pencil. In this manner she changed the provision referring to her brother by giving him $500. She struck out the provision giving $100 to one of her friends and she crossed out the provisions giving the residue of her estate to Father Mathews and appointing him as executor. It is significant, however, that she made no change in the provision which stated that she had made arrangements for the payment of funeral expenses "from other sources than from the properties herein bequeathed" and she made no change in the provision "I declare that the only property I have and own is personal property consisting principally of cash," and no provision was added disposing of her home place.

The appellants contend that the finding that this deed was executed and delivered to the respondent is not supported by and is contrary to the evidence. It is first argued that Mrs. Driscoll was, or thought she was, on her deathbed, that she had already formed a testamentary plan and fixed the method of its accomplishment and that the change in this method was proposed by the attorney, and that the evidence conclusively establishes that she did not understand she was making or intend to make an immediate conveyance to the respondent, but rather understood and intended the deed as a part of the testamentary disposition of her property. If we assume that a part of the evidence and certain inferences which might be drawn would have supported such a conclu-

sion the question was one of fact for the court and the evidence sufficiently supports the findings made in this regard. The evidence of several witnesses discloses that before the execution of the deed the reason for the use of such a form of conveyance was carefully and fully explained to her; that she chose to adopt that procedure rather than to follow her original intention of disposing of all of her property through a will; that the difference in the effect of a deed and a will with respect to one taking effect and passing title immediately and the other taking effect only upon her death was fully explained to her; that she understood this difference and chose to convey the real property by deed because she wanted to make certain that the Church would have the property; that she spoke of both a deed and a will in a manner indicating that she knew the difference between them; and that while she retained the will she directed that the deed be delivered to Father Mathews.

It also appears that she later disclosed a full understanding of what she had done by telling two of her friends that she had deeded the real property to the Church and had also made a will disposing of her personal property, that in the sixteen months which followed she did not express dissatisfaction with what she had done, that during that time she did nothing and said nothing which was inconsistent with the fact that she had deeded the real property to the respondent, and that she did nothing to indicate any lack of understanding as to what she had done, at least until she executed a new will upon her deathbed. In that connection, while it appears that the will then executed was admitted to probate the record now before us discloses nothing further as to her mental condition at that time than the fact that on the morning of December 1, 1939, she was paralyzed and unable to speak and unable to convey any information to Mrs. Smart, and that Mrs. Smart called another attorney when she first returned to the hospital after finding the mutilated will and other papers. The evidence discloses a rather complete case of an execution and delivery of the deed with a full understanding on the part of Mrs. Driscoll as to what she was doing and the effect of the instrument, and there is nothing in connection with the incident, as a result of which the deed was later left in her custody which would compel a conclusion contrary to that reached by the trial court. The fact that after execution and delivery the grantee allowed the deed to be returned to her and to remain in her custody would

not invalidate the deed and does not necessarily negative the fact of an intended execution and delivery. (*Shaver* v. *Canfield*, 21 Cal. App. (2d) 734 [70 P. (2d) 507].)

The appellants further argue that there was no delivery of this deed because both parties believed that it would not be effective until it was recorded, citing *Hotaling* v. *Hotaling*, 193 Cal. 368 [224 Pac. 455, 56 A. L. R. 734] and *Kenney* v. *Parks*, 137 Cal. 527 [70 Pac. 556]. No such situation here appears. We can find no evidence that Mrs. Driscoll asked that this deed be not recorded or that she believed that it would be ineffective until it was recorded. She had been told that it would take effect and pass title immediately and she had changed her testamentary plan and adopted the procedure of a deed with that end in view. Father Mathews had told her that it would not be recorded and that she did not wish it to be recorded may be inferred from the fact that she asked one of her neighbors, after telling her of the execution of the deed, to keep the matter a secret. When she called Father Mathews in November, 1938, she was disturbed and expressed concern over the rumor that she was to be put out on the street rather than with whether or not the deed had been recorded. There is nothing in this evidence which necessarily indicates belief or intention, even on the part of Mrs. Driscoll, that the deed was to remain ineffective until it was recorded. (*Knudson* v. *Adams*, 137 Cal. App. 261 [30 P. (2d) 608]; *Stewart* v. *Silva*, 192 Cal. 405 [221 Pac. 191]; *McCully* v. *McArthur*, 187 Cal. 194 [201 Pac. 323].)

It is further argued that there is a presumption that this deed was obtained through undue influence because of the asserted fact that Father Mathews was at the time acting as Mrs. Driscoll's spiritual adviser, and because she had no independent advice. In the latter connection, it is argued that the attorney who drew the deed was merely a scrivener and not acting as her attorney. It does appear that this attorney acted as something more than a scrivener. He first explained to her the possibility that her wishes would not be carried out by the will, which she contemplated, and when she asked him if there was any sure and certain way to accomplish the purpose she had in mind he suggested the deed with respect to the real property and explained the difference between the effect and operation of a deed and a will. It would serve no useful purpose to consider in detail this matter of undue influence and the exact position occupied by Father Mathews

in connection with the making of this deed. He had never met Mrs. Driscoll before and while he called an attorney at her request he took no part in the actual execution of the deed and but a small part in the events leading up to it. Mrs. Driscoll had some independent advice, and if any presumption of undue influence was present the effect thereof was a matter to be weighed by the trial court as a part of the questions of fact presented.

It is further argued, in connection with the question of undue influence, that the respondent failed to meet the burden resting upon it of affirmatively establishing by clear and convincing evidence that Mrs. Driscoll fully understood and comprehended the effect and result of the instrument. This is sufficiently covered by what we have already said in connection with the first point raised. It is further argued that where such a presumption of undue influence appears the grantee must also establish fairness in dealing and that no such fairness appears because Mrs. Driscoll was induced to evade the law by thus attempting to circumvent and escape the effect of the provisions of the Probate Code (§ 40 et seq.) restricting charitable bequests made within a certain time prior to death. So far as we are advised, there is no law against conveying property by deed under the circumstances which here appear and nothing in the evidence compels a conclusion that there was such an evasion of law as would constitute any unfair dealing.

In our opinion, the entire question was one of fact for the trial court and the evidence is sufficient to sustain the findings made.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 3, 1942.